**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**VAPOR RECOVERY SYSTEMS COMPANY, Respondent.**

**No. 17661.**

United States Court of Appeals Ninth Circuit.

Dec. 31, 1962.

Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin J. Welles and Samuel Singer, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

Hill, Farrer & Burrill, Carl M. Gould and Stanley E. Tobin, Los Angeles, Cal., for respondent.

Before STEPHENS and JERTBERG, Circuit Judges, and STEPHENS, Jr., District Judge.

ALBERT LEE STEPHENS, Jr., District Judge.

This case is before the Court upon the petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended [61 Stat. 136 (1947), 29 U.S.C. § 151 et seq. (1952) as amended by 73 Stat. 519 (1959)], for enforcement of its order issued against Respondent on October 2, 1961. The Board's decision and order are reported at 133 N.L.R.B. 50.

The Respondent is a corporation having its principal office and place of business in the City of Compton, California. Respondent was and is engaged in commerce and in a business affecting commerce within the meaning of Section 2 (6) (7) of the National Labor Relations Act [61 Stat. 137 (1947) as amended 29 U.S.C. § 152 (1952)]. This Court has jurisdiction pursuant to 29 U.S.C. § 160 (e).

The National Labor Relations Board found that Respondent refused to meet with the Oil, Chemical and Atomic Workers International Union, Long Beach Local No. 1–128 AFL-CIO (hereinafter called the Union) for the purpose of negotiating a new collective bargaining agreement after receiving from the Union timely and proper notice of intention to terminate an existing agreement between them. Upon the continuing refusal of the Respondent to meet with the Union for the purpose stated, the Board brought this action for enforcement of its order.

The collective bargaining unit represented by the Union consists of all of Respondent's production and maintenance employees, including truck drivers, but excluding office and clerical employees. The Union and Respondent had an agreement which was effective from January 25, 1960 until January 25, 1961, and subject to automatic renewal for one year periods thereafter in the absence of written notice to terminate.

Intending to exercise the right of termination, the Union mailed a registered letter to Respondent on Wednesday, November 23, 1960, which contained its notice of desire to terminate the agreement. Thursday, November 24, was Thanksgiving Day, and as had been the custom for the last several years, the

plant of Respondent remained closed until Monday, November 28. No personnel, employees or officers were working during this period.

The letter was received in the Compton Post Office on Friday, November 25. Mail for Respondent was not delivered to Respondent's place of business by the Post Office. It was placed in a post box in the Post Office and picked up twice daily by Respondent's messenger. A notice of receipt of the registered mail letter was placed in Respondent's box on November 25. The registered letter was picked up by Respondent's messenger on Monday, November 28.

The envelope was addressed as follows:

"Vapor Recovery Systems, Inc.
2820 North Alameda
Compton, California
Attention: Mr. Frank Long, Jr."

Mr. Frank Long, Jr. was neither an owner, director, manager nor supervisor, nor did he hold any office in the Respondent company. He was an employee working in the factory area as a production scheduler. In fact, he was a member of the Union.

The father of Mr. Frank Long, Jr. was the late Frank Long, Sr., who was President of Respondent at the time the agreement was entered into and until his death during the summer of 1960. He was succeeded to the Presidency by his son, Ray V. Long on July 7, 1960. This fact was announced to all of Respondent's personnel by a notice posted on the company bulletin board.

The letter addressed as noted above was delivered unopened by whoever distributed the mail for Respondent to Mr. Frank Long, Jr. Thinking that the letter was a personal matter between the Union and himself, he put it aside and did not open it until December 1 when he realized that it was not intended for him and turned it over to the Union Steward. This gentleman handed the letter to Ray V. Long, the Respondent's President.

■ It is conceded that to be timely the notice would have to be given not later than November 25, 1960. The sole issue is whether the notice given by the Union was timely. The Board held that it was, but we are of the opinion that it was not.

The issue is approached by both sides as a question of constructive receipt of a notice by mail. This involves both the timeliness of receipt and the correctness of the address. A more fundamental approach may be helpful to the parties and in the resolution of this appeal.

The automatic renewal clause of the agreement between the Union and Respondent contains the following provision:

"* * * this Agreement shall continue in force and effect from year to year thereafter unless either party shall give written notice to the other at least sixty (60) days prior to said anniversary day of January 25th of its desire to terminate this Agreement."

This 60 day notice is required by Section 158(d) of Title 29 U.S.C., which provides in pertinent part as follows:

"* * * *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, * * *."

■ Pursuant to this provision of law, the party entitled to notice is entitled to the full 60 days. The time which will obviously be required to give the notice must not reduce the 60 day period. [Wheeler v. McStay, 160 Iowa 745, 141 N.W. 404, L.R.A.1915B, 181 (1913).] Not only does the law provide for a full 60 days notice, but the agreement says "at least" 60 days, an expression which needs no explanation.

■ Where the giving of written notice is required by statute or contract and the manner of giving the notice is not specified, the general rule is that there must be personal service of the notice. However, it is sufficient to show that the party to be notified received actual written notice, the means employed being unimportant. 66 C.J.S. Notice § 18d (1950); 39 Am.Jur. Notice, § 9 (1942). Even though notice by mail seems to have been the commonly accepted means of transmittal, there is no precedent holding that this is the exclusive means.

In 1 Corbin on Contracts, 881, the author says:

"In the case of an option to terminate existing contractual relations, the power of the option holder is generally to be exercised by giving notice. It should be expressly stated in the agreement just how this notice is to be given and when it will be operative. If the agreement merely provides that one party may terminate by giving notice, the better rule is that the notice will be effective only when received, and not when it is started by mail *or otherwise*." (Emphasis added.)

■ The general rule that a notice to terminate must actually be received is apparently recognized without dissent, as in Konig Brothers, Inc., 108 N.L.R.B. 304 (1954). Personal service, operative only when the notice has been actually received through personal delivery, is no exception. The risks inherent in the means employed to transmit the written notice fall on the party giving the notice, even though it be by personal service. Since the means of transmission are unimportant, it would appear that there is in fact only one rule, to wit: where the means of giving notice are not specified, the notice is effective when received.

In 1 Corbin on Contracts § 78 at page 251, the author comments as follows:

" * * * Probably, when parties use the word 'notice,' they usually mean a communication received.

"So, also, where in an already completed contract, a power of revocation or termination by notice is reserved, the notice is not operative until actually received."

In speaking of options to be exercised by notice, Professor Corbin says:

" * * * But when, by the terms of an already consummated contract it is provided that one party shall have power to produce certain legal results by giving notice, it is usually held that this means notice received in fact and not merely notice mailed. A landlord's 'notice to quit' must be received by the tenant. The power of termination of a contract of employment, or of any other continuing contract can be effectively exercised only by bringing home notice to the other party, not by merely mailing it to him. * * *

"If in an option contract the duty of the promisor is conditional on 'notice within 30 days', does this mean notice received or notice properly mailed? It is believed that, in the absence of an expression of contrary intention, it should be held that the notice must be received. As above explained, the notice is in one aspect a notice of acceptance of an offer; but in another aspect it is a condition of the promisor's already existing contractual duty. It is more likely to be regarded in this latter aspect by the parties themselves. The rule that an acceptance by post is operative on mailing was itself subjected to severe criticism; and, even though it may now be regarded as settled, it should not be extended to notice of acceptance in already binding option contracts." 1 Corbin, Contracts § 264 at pages 878, 879 (1950).

What constitutes actual receipt of written notice has not been well defined in the foregoing quotations or by other authorities. It has been held that service is not effected until the notice comes

into the hands of the one to be served, and he acquires knowledge of its contents, although this has been characterized as a rule of construction only. 66 C.J.S. Notice § 18e(1) (1950). Actual notice has sometimes been subdivided into express notice, equating with actual knowledge communicated, and implied actual notice where knowledge is implied from certain facts. 39 Am.Jur. Notice § 6 (1942).

In Fritz v. Pennsylvania Fire Ins. Co., 85 N.J.L. 171, 88 A. 1065, 5 L.R.A.,N.S., 35, 42 (1913), an insured had received a registered letter containing a notice of cancellation of his insurance which he did not open and read. There was nothing about the envelope which served to give the insured any hint or token that the letter contained anything of interest to him. The Court held that the notice did not operate to cancel the insurance, but couched its ruling in this cautious language:

> "In the case at bar the stipulation in the policy was that the insurer could cancel it by giving five days' notice to the insured, without any provision for constructive notice. Notice, therefore, to be efficacious to cancel the policy, must have been brought home to the insured—that is, brought to his personal attention —or, at least such a situation must have been brought about as to have put the insured upon inquiry, which, had it been made, admittedly would have resulted in actual notice to him." (Emphasis added.)

One thing the authorities agree upon is that personal service of the notice is sufficient. But in this case the notice was not personally served, nor did the method of transmitting the notice employed succeed in imparting knowledge of its contents. Neither would personal service necessarily impart the knowledge. A measure of cooperation of the party noticed is necessary for this accomplishment. The notice must be read. This is an element beyond the control of the party giving the notice and should

not be a factor in judging the adequacy of his performance. When all facts are considered and it appears that enough has been done by the party attempting to give notice to put the party to be affected on inquiry into the contents of the written notice which he has in his hands, it should be held that notice has been given.

Performance should be judged by objective standards. A notice as effectively received as it would have been if personally served should suffice. Personal service accomplishes two things: it puts the writing in the hands of the party entitled to notice and the personal hand-to-hand delivery places emphasis on the importance of the document. Another means designed to do the same should be equally acceptable.

Petitioner heavily relies upon the following quotation from 1 Williston on Contracts, Third Edition, Section 89, page 284:

> " * * * Accordingly, if a letter comes into the possession of the person addressed or of one authorized to receive it for him, or in a place which he has designated as the place for this or similar communications to be deposited for him, the letter has reached its destination and is as effectual though unread as if it were read." (Emphasis is Petitioner's.)

The Restatement of Contracts has adopted a similar statement as Section 69, entitled, "What Constitutes Receipt of Revocation, Rejection or Acceptance."

The foregoing quotation is not specifically referenced to notices nor is the cited portion of the Restatement, but no doubt a notice by mail would be received within the meaning of the law in the circumstances stated. It is erroneous, however, to assume that the Post Office Box of Respondent is "a place which he has designated as the place for this or similar communications to be deposited for him." Had the parties or the statute provided for notice by mail, such would

have been the case, but there was no such designation. Of course, the only way of depositing a communication at this place was by mail.

On November 25 the Union's notice was in the custody of the Post Office. Only a notice of receipt of the registered mail letter by the Post Office was in Respondent's postal box. Respondent had no knowledge that it was there and the letter was not actually received until December 1, 1960. It was literally, personally served on Respondent by the Union Steward, but the service was not timely. To exercise its option of termination it had to bring the news home to Respondent in writing at least by November 25, 1960, and this it failed to do.

At what point the party to be affected by the notice should have been put upon inquiry as to the contents of the notice is an ordinary question of fact, fully dependent upon the then surrounding circumstances. Any other rule which would measure the situation by reference to technical standards would lead to the development of a form of constructive notice.

The Union sent by ordinary first class mail a copy of the notice to E. J. Gund, labor consultant, who had executed the agreement on behalf of Respondent. He was absent from his office from November 24 through 27 and first saw a copy of the letter on Monday, November 28. The Board did not rely upon this notice in making its order which relied upon the findings of the Examiner who stated in his opinion:

"\* \* \* As to his agency for the purposes of receiving such notices, I reach no ultimate conclusion."

All of the evidence which either side wished to offer or which the Examiner desired was taken and the decision was rendered. The evidence must be taken to have been insufficient to establish that Mr. Gund was the agent of Respondent for purpose of receiving the notice on behalf of his principal. The letter to him was, therefore, ineffectual for any purpose.

For the reasons stated, the petition to enforce the order of the Board is hereby denied and the order of the Board is set aside.